365 P.2d 476

Fred HIGGINS and Helen Higgins, his wife, Appellants,

v.

ARIZONA SAVINGS AND LOAN ASSOCI-ATION, an Arizona Corporation, in Re-ceivership, by and through D. O. Saunders, as Superintendent of Banks of the State of Arizona, and Ex-Officio Receiver; Ray B. Lucas and Albert B. Colby, Special Depu-ties Superintendent of Banks of the State of Arizona, and Co-Receivers of the Ari-zona Savings and Loan Association, Ap-pellee.

No. 6965.

Supreme Court of Arizona,

En Banc.

Oct. 11, 1961.

Kenneth Biaett and Dallas P. Richeson, Phoenix, for appellants.

Darrell R. Parker, David J. Perry, C. A. Muecke and Edwin Thurston, Phoenix, for appellee.

UDALL, Justice.

Appellants, Fred and Helen Higgins, applied in writing on March 11, 1955, to appellee, Arizona Savings and Loan Association (hereinafter referred to as the Association), for a loan of $94,800. The purpose of the loan was to refinance certain property then subject to two first mortgages, one second mortgage and a federal tax lien. The amount was sixty percent of the property's appraised value of $158,200 as determined by a Mr. Archer, a qualified appraiser engaged by the Association. His signed written appraisal was dated October 21, 1954. At several times in September and October of 1954, Fred Higgins had met with Max Marcus, a mortgage loan broker, and Jerome Smrt, head loan officer of the Association, to discuss the possibility of such a loan. At these meetings Smrt insisted that the land across the street from the Higgins property would have to be cleared of certain trees, shacks and a junkyard before a loan could be considered. Higgins assured Smrt that the land would be cleared as requested.

On March 11, 1955, Smrt took a one month leave of absence during which time appellants' loan application was "processed" by Betty Jaegers, Smrt's secretary, and Marion Dick, then manager of the Association's Tucson branch and assistant secretary of the Association. James Hubbard, head of the Association's collection and delinquent loans department, during the month of March 1955 signed the following documents at the request of Miss Jaegers: a loan settlement statement setting forth the terms of the loan; a check for $89,937.85 to the Phoenix Title and Trust Company, the escrow agent involved; and one of two escrow instructions relative to the Higgins loan.

These documents were all delivered to the escrow agent. Hubbard also signed a cover letter of March 30, 1955, to Mr. Higgins indicating enclosure of a loan account book (signed by Hubbard) and a bank-by-mail envelope. The letter also advised him that the first payment on the loan would be due on May 1, 1955. Subsequently appellants received two notices that the May 1st payment was due. Appellants made no payments to the Association save a deposit of one dollar necessary to qualify them as members. On March 30, 1955, an entry on an Association loan card (entitled "Definite Contract Loan") indicated a balance due on the Higgins loan of $94,800.

Smrt, upon his return on April 11, 1955, discovered the extent to which the Higgins loan had been "processed" and, on May 19, 1955, retrieved the Association's check from the escrow agent. Smrt testified that his reason for doing so was that property across the street from that of appellants' was not being cleared of trees, shacks and a junkyard as Higgins had represented would be done.

On July 7, 1955, the District Director of the Internal Revenue Service notified the

escrow agent of its intention to release the Higgins property from a federal tax lien pending notification of satisfaction of all other loan requirements by Higgins. The latter had previously satisfied all other requirements for the loan, including obtaining releases of mortgages and satisfying an outstanding judgment, except those, such as payment of city taxes (normally paid out of the loan proceeds) and execution of a note and mortgage in favor of the Association, which would have been taken care of at the closing. It was at this time (after July 7th) that Higgins first learned that the check had been taken back by the Association on May 19th.

On July 14, 1955, an officer of the Phoenix Title and Trust Company was informed by Smrt that the Higgins loan would probably be transacted through ten small escrows which could be more easily resold than one large loan. But, in a letter dated August 25, 1955, Smrt informed appellants that:

"Your application for a first mortgage loan in the amount of $94,800.00 * * * has been given careful and sustained consideration by the Association. Alternate appraisals have been obtained and after full consideration of the many factors involved, we find that we are unable to approve and make this loan.

"While the property offered as security is good property, certain surrounding circumstances, location, street conditions, and the ratio of the desired loan to reasonable market value, as determined by alternate appraisals make it impossible for our favorable consideration of this loan."

The escrow agent was directed by Smrt to cancel the ten escrows on September 18, 1955. Appellants were unable to secure a loan elsewhere, and in April of 1956 the property was sold at sheriffs' sales. Whereupon appellants instituted suit against the Association claiming as damages their lost equity in the property and expenses incurred in unsuccessful attempts to secure another loan.

This case was first tried to a jury in February of 1957 when, at the conclusion of plaintiffs' case, the Association's motion for directed verdict was granted upon the ground that A.R.S. § 6–410 (1956)[1] had not been complied with. Section 6–410, subd. A., par. 1. provided, *inter alia*, that associations such as appellee should make no loans " * * * except upon the report in writing of two appraisers giving the conservative market value of the property to be mortgaged." On appeal this court held that. "whether the Association, on the record presented, was estopped to deny its compliance with said section" was a question

---

1. Now A.R.S. § 6–405, 445 (Supp.1960).

of fact which should have been submitted to the jury. Higgins v. Arizona Savings and Loan Association, 1958, 85 Ariz. 6, 9, 10, 330 P.2d 504, 506, 507. Accordingly, the judgment was reversed and a new trial ordered. The second trial in May of 1959 resulted in a verdict for the defendant Association. This is an appeal from the judgment entered thereon and from the order denying a motion for a new trial.

Appellants' twenty-five assignments of error comprise three main contentions: first, that the evidence disclosed a contract to make a loan as a matter of law and hence the trial court erred in submitting that issue to the jury; second, that the trial court committed reversible error in admitting certain items in evidence and not excluding certain testimony of appellee's witnesses; and third, that conduct of appellee's counsel at trial was so improper as to deny appellants a fair trial.

Question of Existence of Contract

■ The trial court properly submitted for jury determination the issue of whether an agreement to lend had been made. Preparation and signing of the loan settlement statement, the escrow instructions, the loan account book and the check, though strong evidence of appellee's intention to make a loan, were not conclusive of that fact. There was substantial testimony introduced by each side regarding appellee's insistence that property near appellants' land be cleared of trees, shacks and a junkyard. From this the jury could have inferred that clearance of such property was regarded by the parties as a condition precedent to any loan appellee might agree to make. Moreover, on the record presented the jury could have found that the documents prepared by appellee in connection with the Higgins loan application were routine steps taken concurrently with negotiations by the parties as to the terms and conditions of the loan. Under such circumstances the trial court was not compelled to find that the evidence conclusively established existence of an agreement to lend. As this court stated in Firchau v. Barringer Crater Co., 1959, 86 Ariz. 215, 222, 344 P.2d 486, 490–491:

"' * * * where the existence and not the validity or construction of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury to determine whether the contract did in fact exist, * * *.'"

Therefore, appellants' first three assignments of error are without merit.

■ Appellants' assignment twenty-two is that the trial court erred in instructing the jury on the law of estoppel. It is contended that the instruction, although admitted to be a correct statement of the law and in accordance with the decision of this.

court on the first appeal (see 85 Ariz. 6, 9–10, 330 P.2d 504), should not have been given because the evidence disclosed that as a matter of law the Association was estopped to plead noncompliance with the statutory requirement of two signatures on the appraisal. The evidence presented on this issue, however, was controverted. Therefore, as this court held in the previous appeal, whether the Association was estopped to plead noncompliance was a question properly submitted to the trier of fact.

## Evidentiary Questions

Appellants' assignments of error four, five, seven and twenty-four are that the trial court improperly allowed witnesses Goodson (an escrow officer of the Phoenix Title and Trust Company), Smrt and Dick to testify as to negotiations concerning clearing of the land near appellants' property. Such testimony, it is asserted, was received in violation of the parol evidence rule. The rule was defined by this court in S. H. Kress & Co. v. Evans, 1920, 21 Ariz. 442, 447, 189 P. 625, 626 as follows:

"* * * *when parties have put their engagements into writing in such terms as import a legal obligation without any uncertainty as to the object or extent of such engagement,* it is conclusively presumed that the whole engagement of the parties, and the extent and manner of the undertaking was reduced to writing, and all oral testimony of a previous colloquium between the parties, or of conversations or declarations at the time it is completed, or afterwards, is rejected." (Emphasis added.)

Application of the parol evidence rule depends initially upon a finding that the parties intended to and have reduced all of the essential terms of their agreement to writing. But in the case at bar the threshold issue for determination by the jury was whether there even *existed* an engagement (to lend) "in such terms as import a legal obligation." The statement of Erle, J., in Pym v. Campbell, 6 El. & Bl. 370, 119 Eng.Rep. 903, 905 (Q.B.1870), although made in reference to an exception to rather than to inapplicability of the parol evidence rule, is pertinent here: "The distinction in point of law is that evidence to vary the terms of an agreement in writing is not admissible, but evidence to show that there is not an agreement at all is admissible." Accordingly, the testimony as to the subject matter of negotiations relating to the alleged agreement to lend was properly received and the trial court did not err when it instructed the jury that:

"* * * * in determining the exact provisions and conditions of the agreement, if any, between plaintiffs and defendant you should consider all of the circumstances attending the transaction, the writings or documents in evi-

dence and the discussions between them and all the facts and circumstances shown by the evidence which throws any light on the precise agreement of the parties."

Appellants' sixth assignment of error is that the trial court erred in permitting appellee's counsel to read into evidence the testimony given at the first trial by Marcus who died between trials. Marcus' testimony was to the effect that at the meetings with Higgins and Smrt in October of 1954 Higgins was informed by Marcus that the latter could not secure a loan for him because of the condition of the nearby property. Marcus also testified that Smrt insisted that such property be cleared and that appellant Higgins "promised" that such would be done. Such testimony, it is claimed, was not material. As the issue of whether clearance of the nearby property was a condition precedent to the alleged agreement to lend had been raised by the pleadings, Marcus' testimony as to what Smrt and Higgins said during the conversations in that regard was clearly material. And, although Marcus' testimony concerning why *he* could not secure a loan for appellants was not directly probative of any of the issues in the case:

"* * * we must recognize that a considerable leeway is allowed even on direct examination for proof of facts which are not really offered as bearing on the dispute, however defined, but merely as details which fill in the background of the narrative and give it interest, color and lifelikeness." McCormick, Evidence, § 152, p. 315 (1954).

In determining the relevancy and admissibility of evidence the trial judge is invested with considerable discretion. There was no abuse of that discretion manifested in this instance.

Appellants' assignments eight, nine, ten, eleven, twelve and thirteen complain of the trial court's admission of immaterial testimony in evidence. This testimony concerned appellant Fred Higgins' financial circumstances, requirements listed in the escrow instructions and negotiations among Higgins, Smrt and Marcus. Again this court cannot say that, on the record presented, the trial judge permitted an unduly wide range of inquiry respecting the issues to which such testimony related.

Assignment fourteen is that the court below erred in allowing Smrt to testify with respect to his lack of knowledge of appellants' probable loss of their property through foreclosure in the event a loan was refused them. It is argued that the testimony was immaterial and irrelevant and that it constituted a false and improper defense for appellee. In this connection, in assignment twenty-three appellants assert error in the following portion

of the trial court's instructions to the jury:

"* * * if you find from the preponderance of the evidence that the defendant did agree to make a loan to plaintiffs and did thereafter prepare such agreement all as alleged by plaintiffs in their complaint under the instructions which I have heretofore given you, then it shall be your duty to award the plaintiffs a sum which will compensate them for the damages, if any, suffered by plaintiffs as are proximately traceable to the defendant's breach provided, however, that such damages are limited to those damages that the parties had reason to foresee at the time when the contract was made.

"In other words, the law limits the recovery of a plaintiff to compensation for only those damages that the parties had reason to foresee as a probable result of the breach at the time when the contract was made."

By this instruction it is alleged that the trial court "improperly allowed the jury * * * to decide if the plaintiffs should be allowed to recover the damages they sustained."

In Shurtleff v. Occidental Building & Loan Ass'n, 1921, 105 Neb. 557, 561, 181 N.W. 374, 375–376, the court stated the general rule as to the measure of damages for breach of contract to lend money as follows:

"The measure of damages for a breach of a contract to lend money is usually * * * the difference between the contract interest rate and the increased interest rate the borrower is obliged to pay in procuring a new loan. There are certain exceptions to this rule, one of which is that, where it appears that the specific purpose for which the loan was made was communicated to the lender at the time the contract was entered into, and where it further appears that the borrower has suffered special damages by the breach, which are pleaded and proved, the damages recoverable are such as may fairly and reasonably be supposed to have been in the contemplation of the parties at the time of making the contract, as the probable result of a breach of it. The leading case upon this general subject, and one frequently cited by the courts, is Hadley v. Baxendale, 9 Exch. (Eng.) *341, *354, in which it is said:

" 'Where two parties have made a contract, which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered, either arising naturally, that is, according to the usual course of things, from such breach of contract itself, or

**64**

such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. *Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated.'* " (Emphasis added.)

The testimony bearing on appellee's knowledge of the "special circumstances" surrounding appellants' intended use of the loan proceeds was therefore properly received. Assuming the jury had found the existence of an agreement to lend and breach thereof by appellee in the instant case, it would then have been their duty to determine "whether such facts were reasonably within the contemplation of the parties, and whether it must have been reasonably contemplated that special damages would be suffered by a failure to carry out the agreement * * *." Shurtleff v. Occidental Building & Loan Ass'n, 1921, 105 Neb. 557, 562–563, 181 N.W. 374, 376.

■ And the instruction in question correctly paraphrased the rule of Hadley v. Baxendale, quoted in the Shurtleff case. "This case is the polar star to which the courts of both England and America have looked for guidance in ascertaining the true rule as to the measure of damages for breach of contract." McFadden v. Shanley, 1914, 16 Ariz. 91, 95, 141 P. 732, 733.

■ In assignments fifteen and sixteen appellants contend that the trial court erred in permitting two of appellee's officers to testify that preparation of certain of the documents involved in the processing of the Higgins loan application was a mistake. Such testimony, appellants argue, constituted opinion evidence which should have been excluded. This court stated in Board of Regents of University, etc. v. Cannon, 1959, 86 Ariz. 176, 178, 342 P.2d 207, 209:

> "The question of whether any witness, whether or not designated 'expert' is competent to testify on a given subject rests in the sound discretion of the trial court, and its exercise will not be reviewed but for abuse."

The witnesses, Smrt and Dick, were both officers of the appellee and familiar with the Association's lending operations and procedures. Even if their testimony was opinion evidence the trial court, in admitting such, did not abuse its discretion.

■ Appellants in assignment twenty-five complain of the trial court's refusal to give appellants' requested instruction seventeen to the effect that unilateral mistake in

the expression of an agreement ordinarily affords no ground for rescission. The requested instruction, although a correct statement of the law, simply was not applicable to the facts of this case. The Association did not contend that there was either mutual or unilateral mistake regarding the subject matter or terms of the alleged agreement to lend. On the contrary the Association contended that no such agreement to lend ever existed. The trial court did instruct the jury that:

" * * * whether the officers of the defendant company who dealt with the public, including this plaintiff, made mistakes in issuing passbooks, sending payment notices and the like, if such are facts disclosed by the evidence in this case, is not to be considered by you as evidence in determining the question of whether a loan contract in the first instance was made between the parties to this lawsuit."

This instruction was adequate under the circumstances.

Appellants' seventeenth assignment of error is that the trial court erred in admitting in evidence exhibit thirty-six, a photograph purporting to represent the shacks and trees on the property across the street from that of appellants'. Counsel for appellee asked Mr. Archer, the appraiser, whether the latter "had ever seen the terrain and the property that is depicted by the picture." Archer replied:

"I will say it is the same type of structure and trees that I have seen across the street from the subject property, but I can't identify this."

There followed a discussion among counsel and the court as to whether the photograph had been properly identified by the witness. Counsel for appellee then asked the witness:

"Mr. Archer, let me ask you the question again so we can lay a proper foundation for the introduction of the exhibit into evidence. Is this photograph a reasonable representation of the scene in substantially the same condition as it was during the time that you examined the premises for the purpose of your appraisal?"

And the witness answered:

"I would say yes to that. I don't want to say that is a picture of the property, because I have no way of knowing, but I would say it is a reasonable representation."

The exhibit was then received in evidence over appellants' objection.

In Humphrey v. Atchison, T. & S. F. Ry. Co., 1937, 50 Ariz. 167, 172, 70 P.2d 319, 321–322, this court stated:

"The general rule as to their admissibility is that if a photograph be a substantially correct reproduction of the scene of the accident, and if it will aid the jury in understanding the testimony, it should be admitted, and that

its admissibility, both so far as it is in fact a true reproduction of the scene and whether it is practically instructive to the jury, is a preliminary question to be determined by the trial judge, who is invested with considerable discretion in the matter, and his action will ordinarily be sustained by the appellate court."

Whether the "reproduction of the scene" or object in question must be exact and precise varies with the purpose for which the photograph is offered. As stated by Hamersley, J., in the leading case of Cunningham v. Fair Haven & W. R. Co., 1899, 72 Conn. 244, 250, 43 A. 1047, 1049:

"When it is offered as a general representation of physical objects as to which testimony is adduced for the mere convenience of witnesses in explaining their statements very slight proof of *accuracy* may be sufficient; but when it is offered as representing handwriting which is to be subjected to minute and detailed examination, or any object where slight differences of height, breadth or length are of vital importance, much more convincing proof should be required." (Emphasis added.)

■ Ordinarily it is not necessary that a photograph be identified by the person who actually took the picture. Nor need the verifying witness have been present when the picture was taken. But the photograph must be *identified*. The trial judge's "considerable discretion" exists with respect to (1) the picture's accuracy in portraying the object photographed, and (2) the practical utility of the photograph to the jury. It is only *after* the photograph has been properly identified by the witness as a representation of the object or place in issue that these two questions of fact present themselves to the trial judge. Professor McCormick observes:

"It is the facts represented, the scene or the object that * * * [the witness] must know about, and *when* this knowledge is shown he can say whether the photograph correctly portrays these facts." McCormick, Evidence, § 181, p. 387 (1954). (Emphasis added.)

And Wigmore wrote:

"Conceding the verisimilitude of any particular photograph's reproduction of the object photographed, there remains always the assumption that the object photographed is identical with the object in issue. This assumption underlies, of course, all use of photographs, as it does that of all other forms of testimony." III Wigmore, Evidence, § 798, p. 201 (3d ed.)

■ Plainly error was committed in admitting exhibit thirty-six in evidence. But, on the record presented, admission of the photograph was at most harmless error.

There was introduced by each side substantial testimony relevant to the condition of the land across the street from that of appellants' property. Moreover, appellant Fred Higgins testified in response to his own attorney's question, that houses in another photograph (exhibit thirty-seven) which were not discernibly different in appearance from those shown in exhibit thirty-six, were in fact on land across the street.

█ Assignment eighteen is that error was committed in (1) permitting Ana Frohmiller, an employee of Southwest Savings & Loan Association, to testify as to the appraised value of the Higgins property when it was first mortgaged in 1953 and (2) allowing the appellee to introduce a certified written appraisal, made and signed by one Dodt and signed also by Frohmiller, as a business record. The short answer to the first contention is that the record does not disclose that Frohmiller did testify to the value of the property. Secondly, the written appraisal was made in the course of Southwest's loan negotiations with Higgins in 1953 and became a part of the records of that association.

Section 2 of Rule 44(q) of the Rules of Civil Procedure, 16 A.R.S., (see also A.R.S. § 12–2262, subd. B (1955)), identical to Section 2 of the Uniform Business Records as Evidence Act of 1936, reads as follows:

"Any record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as [to] justify its admission."

The statute was enacted in 1951 " * * * to liberalize the theretofore clumsy and unnecessarily hampering technicalities which only tended to prevent getting at the truth." Colvin v. Westinghouse Electric Corporation, 1955, 79 Ariz. 275, 277, 288 P.2d 490, 491–492. See also Builders Supply Corporation v. Shipley, 1959, 86 Ariz. 153, 157, 341 P.2d 940, 943. In the instant case the trial judge satisfied himself that the appraisal was part of Southwest's records prepared in connection with its loan to Higgins. Admission of the appraisal was not an abuse of his discretion in the matter.

█ In assignment nineteen appellants predicate error on the admission of testimony of one Woods respecting an appraisal made of the Higgins property at appellee's request in August of 1955. Two grounds are offered. First: it is contended that Woods had not been properly qualified by appellee as an expert for the purpose of

giving testimony as to real property values. The witness testified initially that he was a real estate agent and broker. Appellants' counsel objected to Woods' testimony on the ground that the witness was not a member of any professional appraisers organization. The trial court correctly overruled the objection; lack of membership in such organizations went solely to the weight of the witness's testimony. See State ex rel. Morrison v. Jay Six Cattle Company, 1960, 88 Ariz. 97, 100–101, 353 P.2d 185, 187–188; Board of Regents of University, etc. v. Cannon, 1959, 86 Ariz. 176, 178, 342 P.2d 207, 209, Annotation, 159 A.L.R. 7, 10, 36–38 (1945).

Second: Woods testified that he had submitted penciled notations of his appraisal to appellee on or about August 15, 1955. The typewritten and signed appraisal made from such notes bore the date of September 5, 1955, and was admitted in evidence to prove the facts stated therein. Appellants object to the admission in evidence of Woods' testimony as to the fact of his having given appellee the results of the appraisal, in the form of the penciled notations, before the formal document was prepared on September 5th. Such testimony, it is claimed, was not the best evidence of the transmission of that information to appellee. Rather, appellants contend, the penciled notations themselves should have been produced in court.

Appellants' argument on this point fails to recognize that the best evidence rule is applicable only where a litigant seeks to prove the *terms* of a writing. In such a case the original document itself must be produced unless shown to be unavailable and then due to no fault of the litigant seeking to prove such terms by other means. As such the rule has no application in this instance where what was testified to was the fact of sending rather than the terms of the notations. IV Wigmore, Evidence, § 1242 (3d ed.). See also Udall, Arizona Law of Evidence, § 156 (1960).

### Conduct of Counsel

Appellants' twentieth assignment of error sets out thirty instances of alleged improper conduct on the part of counsel for appellee. The record discloses, however, that the remarks and actions complained of were, in all but one exchange, either provoked by appellants' counsel, withdrawn or properly disposed of by rulings of the trial judge. The one instance of improper conduct by appellee's counsel requiring comment by this court occurred as follows.

One of the loan requirements listed by the Phoenix Title and Trust Company was a showing that Fred Higgins was current in payments due his former wife under judgment in a divorce case. Appellants introduced a cancelled check endorsed by the former wife to substantiate appellants' compliance with the requirement. On

cross-examination of appellant counsel for appellee asked:

'"Now, Mr. Higgins, did any of your seven other previous wives ever have judgments from their divorce—[?]"

Counsel for appellants objected and asked "that the question be stricken from the record." The court sustained the objection but did not instruct the jury to disregard the question.

That the question asked had no bearing on the subject matter of the inquiry is clear. It was evidently interjected solely to prejudice appellant Fred Higgins' character in the eyes of the jury. As stated in Ruth v. Rhodes, 1947, 66 Ariz. 129, 136, 185 P.2d 304, 308:

"* * * [T]his court will not countenance 'cross-examination by insinuation' the sole purpose of which is to leave an impression with the jury of a fact or state of affairs that is not proved, or to get before the jury by indirection that which would not be directly admissible."

The trial court, however, is invested with great discretion in the conduct and control of the trial. Buehman v. Smelker, 1937, 50 Ariz. 18, 25, 68 P.2d 946, 949. And determining whether to admonish the jury to disregard improper remarks by counsel or merely to sustain an objection thereto is likewise discretionary with the trial court subject to review only for abuse. Cf. Lane v. Mathews, 1952, 74 Ariz. 201, 207, 245 P. 2d 1025, 1028, *reversed on other grounds on rehearing*, 1952, 75 Ariz. 1, 251 P.2d 303. This court cannot say that, on the record presented, the action taken by the trial court in this instance was an abuse of that discretion.

Assignment twenty-one is that the trial court erred in denying appellants' motion for a new trial on the ground that the court reporter, when requested by the Association's counsel to take stenographic notes of the closing arguments of appellants' counsel, did not also record the arguments (allegedly improper) made by counsel for the Association. Since there is nothing in the record to support such a contention this court will not deal with assignment twenty-one. Cf. Grimm v. Beard, 1945, 63 Ariz. 281, 161 P.2d 924.

For the reasons indicated above the judgment of the court below is affirmed.

STRUCKMEYER, C. J., and BERNSTEIN, JENNINGS and LOCKWOOD, JJ., concur.